**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KIA & KAT, LLC and<br>SIAVASH KHOSRAVIKARIJI,<br><br>       Plaintiffs/Counter-Defendants,<br><br>v.<br><br>TODD BARNHARDT,<br>LMLC FRANCHISING, LLC, and<br>LMLC MANAGEMENT, LLC,<br><br>       Defendants/Counter-Plaintiffs. | Case No. 19 C 3407<br><br>Hon. LaShonda A. Hunt |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Kit & Kat, LLC ("K&K") and Siavash Khosravikariji ("Mr. K.") sued Defendants Todd Barnhardt ("Barnhardt"), LMLC Franchising, LLC ("LMLC-F"), and LMLC Management, LLC ("LMLC-M") for claims arising from a failed enterprise to establish childcare center franchise locations under the name Little Minds Learning Center ("LMLC"). This case proceeded to a bench trial on January 16, 2025.[1] Having now considered the stipulations of the parties, the relevant testimony offered in both this case and related case *Aylin & Ramtin et al. v. Barnhardt, et al.*, admitted evidence, arguments presented during trial, and applicable case law, the Court issues the following verdict: (1) as to all claims in Plaintiffs' complaint—in favor of Defendants and against Plaintiffs; and (2) as to the claims in Counter-Plaintiffs' complaint—(a) in favor of Counter-Plaintiff LMLC-M and against Counter-Defendant K&K on Count I, awarding damages in the amount of $74,667.56; (b) in favor of Counter-Plaintiff LMLC-F and against Counter-Defendant K&K on Count III, awarding damages in the amount of $34,991.00; and (3) in

---

[1] No counsel for Plaintiffs/Counter-Defendants admitted to either the general bar or trial bar for this district appeared at trial. Only counsel for Defendants/Counter-Plaintiffs appeared and presented testimony from Barnhardt in support of their counterclaims.

favor of Counter-Defendants and against Counter-Plaintiffs on Counts II, IV, V, and VI. This decision sets forth the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## PROCEDURAL BACKGROUND

The Court presumes familiarity with the procedural history of this case, as explained in the oral ruling on February 21, 2024 resolving Defendants' motion for summary judgment, (Dkt. 176), and in the post-trial Memorandum Opinion and Order entered in the related case, *Aylin & Ramtin. LLC, et al. v. Barnhardt, et al.*, No. 19 C 3402, Dkt. 158 (N.D. Ill. Nov. 27, 2024).

After the summary judgment decision in this case, the following pleadings remained operative for trial:

- **Plaintiffs' Complaint**:
  - Count I – Breach of Contract (K&K v. LMLC-M);
  - Count II – Breach of Fiduciary Duty (K&K v. Barnhardt & LMLC-M);
  - Count IV – Fraudulent Misrepresentation (Plaintiffs v. Barnhardt & LMLC-M); and
  - Count VI – Fraudulent Misrepresentation (Plaintiffs v. Barnhardt & LMLC-F).[2]

(Compl., Dkt. 1).

---

[2] The Court granted partial summary judgment to Defendants on the fraudulent misrepresentation claims but only to the extent the claims were based on misrepresentations contained *in* the contract documents. Summary judgment was denied to the extent the claims were based on misrepresentations made *during* contract performance. (Dkt. 176).

- **Defendants' Affirmative Defenses ("ADs")**:

  o AD 1 – Contractual Disclaimer of Responsibility & Defendants' Assumption of Risk;
  o AD 2 – Supervening or Intervening Cause (MBM Plus, LLC's non-performance);
  o AD 3 – Failure to Join Party under Rule 19;
  o AD 4 – Breach by Plaintiffs;
  o AD 5 – Failure to State a Claim;
  o AD 6 – Lack of Privity of Contract
  o AD 7 – Duress (Untimely Capital Contributions);
  o AD 8 – Failure to mitigate damages; and
  o AD 9 – Supervening Cause (MBM Plus, LLC and Attorney Kameli).

(Am. Ans. & ADs, Dkt. 41).

- **Defendants/Counter-Plaintiffs' Counterclaims:**

  o Count I – Breach of Contract for Capital Contributions (LMLC-M v. K&K);
  o Count II – Breach of Contract for Authority and Operations Impairment (LMLC-M v. K&K);
  o Count III – Breach of Franchising Agreement (LMLC-F v. K&K);
  o Count IV – Interference with Existing Beneficial Relationships (LMLC-M & LMLC-F v. Plaintiffs);
  o Count V – Interference with Business of Defendants LMLC-M and LMLC-F (LMLC-M & LMLC-F v. Plaintiffs); and
  o Count VI – Breach of the Covenant of Good Faith and Fair Dealing (LMLC-M & LMLC-F v. Plaintiffs).

(Am. Countercl., Dkt. 40).

- **Plaintiffs'/Counter-Defendants' ADs:**

  o First AD – Fraudulent Misrepresentation;
  o Second AD – Equitable Estoppel; and
  o Third AD – Material Breach – Excuse.

(Ans. to Defs.' Am. Countercl., Dkt. 123).

During the half-day bench trial on January 16, 2025, the Court heard testimony from Barnhardt in support of Defendants' counterclaims for breach of contract (Count I) and breach of franchising agreement (Count III). The Court agreed to generally consider any prior relevant background testimony elicited at the related *Aylin & Ramtin* bench trial on November 12-14, 2024, from Angelica Bermejo, a former paralegal/current office manager employed by the law firm of

3

Kameli Law, P.C., the firm of Plaintiffs' counsel, Taher Kameli; Foroud Sharegh, a businessperson who worked with Defendants and Plaintiffs at various times; and Barnhardt. As indicated *supra*, Plaintiffs did not appear at the trial in this case either individually or through admitted counsel to present any witness testimony; however, some agreed stipulations of fact were submitted in advance of trial. Finally, the Court admitted all joint documents into evidence, including the pertinent contract documents, financial records, and email communications, and took judicial notice of certain filings in Defendants' bankruptcy proceedings.[3] The Court thus closed the record and took the matter under advisement.

## FINDINGS OF FACT

The following findings of fact consist of stipulated facts taken from the parties' joint Final Pretrial Order, (Dkt. 196 at 3-8), and any additional facts gleaned from trial testimony and admissible documentary evidence. The findings are also based on matters subject to judicial notice and the Court's credibility determinations after observing witnesses testify. All findings are by a preponderance of the evidence or, when applicable, clear and convincing evidence.

### I. LMLC's History

1. LMLC was a childcare center business established in approximately 2009 with a location in Hudson, Wisconsin.

2. In 2013, LMLC Holdings, Inc. ("LMLC-H") was formed to own other entities that were part of the LMLC business.

3. Barnhardt and his spouse each owed a 28% interest in LMLC-H.

---

[3] *See In re LMLC Franchising, LLC*, No. 19 B 13901 (Bankr. W.D. Wis.); *In re LMLC Management, LLC*, No. 19 B 13900 (Bankr. W.D. Wis.); *In re Barnhardt*, No. 19 B 13897 (Bankr. W.D. Wis.); *Layng v. Barnhardt (In re Barnhardt)*, No. 20 A 53 (No. 19 B 13897) (Bankr. W.D. Wis.); *Aylin & Ramtin, LLC v. Barnhart (In re Barnhardt)*, No. 20 A 25 (No. 19 B 13897) (Bankr. W.D. Wis.).

4.     Between 2009 and 2015, the business expanded to a handful of additional locations, most of which were at least partially owned by LMLC-H.

5.     In approximately 2015, LMLC shifted its business model towards franchising.

6.     LMLC-F, an entity wholly owned by LMLC-H, was created to contract with ownership entities created and owned by investors to license LMLC franchises.

7.     LMLC-M, an entity wholly owned by LMLC-H, was created to contract with ownership entities to establish and operate LMLC franchises.

8.     Barnhardt was the president and CEO of LMLC-H, and the manager of both LMLC-M and LMLC-F, and a minority shareholder in LMLC-H.

9.     Only Barnhardt, LMLC-M, and LMLC-F are Defendants in this case; LMLC-H is not.

## II.     LMLC's Foreign Investor Franchise Model

10.     Barnhardt came into contact with Kameli and Sharegh and learned of an opportunity to attract foreign franchise investors through the EB-5 Immigrant Investor Program.

11.     The EB-5 Program allows foreign investors to become lawful permanent residents of the United States by investing in commercial enterprises in the United States that meet certain criteria including the full investment of specified amounts and creation of a specified number of jobs.

12.     During the relevant time period, the EB-5 Program required foreigners to invest a minimum of $500,000 in businesses in targeted employment areas (TEA) or $1M for businesses in other areas that create at least ten (10) U.S. jobs within a number of years.

13.     Today, to qualify for lawful permanent residence through the EB-5 Program, foreigners must invest a minimum of $800,000 in businesses in a TEA or $1.15M for businesses in other areas.

14.     Foreigners seeking a visa through the EB-5 Program first file a petition with the United States Citizenship and Immigration Service (USCIS). In response, USCIS sends a request for evidence (RFE), specifically financial information about the company in which a petitioner has invested.

15.     Bermejo, in her role as a paralegal at Kameli Law from 2017-2019, worked with John Kloss, an immigration attorney at the law firm, to prepare multiple EB-5 petitions and gather supporting documents for USCIS consideration.

16.     After LMLC-F received government approval to offer franchises for sale, LMLC directly and through employees or agents began marketing LMLC franchises to foreign investors.

17.     LMLC-F was created to contract with an ownership entity created and owned by the investor to license the LMLC franchise.

18.     LMLC-M was created to contract with the ownership entity to establish and operate the franchise.

19.     In 2016, Sharegh started working for LMLC as a foreign sales manager for potential investors. Sharegh eventually formed his own company to broker franchise deals with foreign investors.

**III.     <u>Plaintiffs' Investment in LMLC Franchises</u>**

20.     In April 2017, Mr. K. decided to invest in two LMLC franchises in Crystal Lake, Illinois and Montgomery, Illinois.

6

21.     Defendants caused the required disclosures to be immediately provided, and the transaction proceeded quickly.

22.     The disclosure documents included an FDD Addendum, Franchise Agreement, Management Agreement, Confidentiality & Noncompete Agreement, and a Power of Attorney Agreement.

23.     The disclosures included information about fees, the estimated initial investment, the opening timeline, pro forma, anticipated timelines, expenses, and other franchise locations, among other things.

24.     Within weeks of making the disclosures, the parties had discussed initial funding and secured approval of anticipated franchise sites; Mr. K. formed K&K to own the LMLC franchises; and legal documents including franchise agreements, management agreements, a power of attorney, and leases were drafted and exchanged.

25.     Mr. K. is an Iranian national and the sole member of K&K, a limited liability company set up to own and invest in LMLC franchises.

26.     At all relevant times, Mr. K. was located in Iran and spoke Farsi. Both Sharegh and Kameli also spoke Farsi. Barnhardt has never met Mr. K. in person.

**A.     <u>Contract Formation</u>**

27.     On April 26, 2017, the parties executed documents to effectuate the franchise purchase including the Franchise Agreements, (PX 2, PX 3), and Management Agreements, (PX 4, PX 5), a Power of Attorney ("POA"), (PX 7), and other related documents.

28.     For all practical purposes, the Franchise and Management Agreements for the Crystal Lake and Montgomery locations are the same.

7

29.     The Franchise Agreements provided that K&K agreed to pay, for each location, "an initial license fee of $20,000. The initial license fee, when paid, shall be deemed fully earned and nonrefundable. The initial license fee shall be due and payable at the execution of this Agreement." (PX 2, PX 3).

30.     The Management Agreements provided, in pertinent part, that:

> 1. **MANAGEMENT AND OPERATING RESPONSIBILITY**. [K&K] appoints [LMLC-M] as the agent and representative to supervise and direct, for and at the expense of [LMLC-M], the management, operation[,] and maintenance of the Business on the terms and conditions herein provided.
>
> 1.1 **OPERATING AUTHORITY**. [LMLC-M] shall have, full power, authority, discretion and control in all matters relating to the management, operation and maintenance of the Business, including employment policies (b) the receipt, holding and disbursement of funds; (c) accounting; (d) budget; (e) maintenance of bank accounts; (f) procurement of inventories, supplies and services; (g) advertising, promotion, sales, marketing and publicity; (h) labor policies (including hiring and firing of all employees, (if Franchisee is in process for the EB-5 Immigrant Investor Program and Franchise is created for purposes of EB-5 requirements, Manager shall maintain the minimum number of jobs required for compliance); (i) granting and limiting of credit, and establishment of credit in connection with the operation of the Business (including entering into policies and agreement with credit card organizations); (j) determination of the terms of enrollment for children in the School, including charge, tuition and fees; and (k) entering into such contracts, agreements and other undertakings as [LMLC-M] shall from time to time consider appropriate. [K&K] also entrusts [LMLC-M] with reasonable usage and management of funds placed in the Operating Capital Account provided that nothing in this or any other agreement shall be deemed to grant a right of ownership of the Operating Capital Account or any other entrusted sums in Manager. Manager hereby renounces any claim in ownership of funds in the Operating Capital Account and other profits earned from management of the School, except as set forth in the Franchise Agreement or this Agreement and agrees that the management fee paid as part of the contemporaneous Franchise Agreement shall be adequate and just compensation for its services. [LMLC-M] is at all

8

times bound by the fiduciary duty owed to the [K&K] in management of the School, the Operating Capital Account, and profits earned, and shall not take any action, enumerated or unenumerated, or fail to take any action specifically provided for within this Agreement that shall harm [K&K's] interests in the School or the Operating Capital Account or in profits earned or in Franchisee's immigration proceedings."

\*\*\*

2. **<u>SERVICES AND DUTIES OF MANAGER</u>**. [LMLC-M] will perform all activities necessary or reasonably required to operate the Business.

\*\*\*

2.13 [LMLC-M will] Manage the Operating Capital Account such that the account is not depleted, and communicate with [K&K] regarding the balances of the operating account.

\*\*\*

2.21 Any transaction over $5,000, excluding payroll, lease, or amount due to [K&K] or [LMLC-M] under the Franchise agreement and this Agreement, any amount due to a third-party approved by the [K&K] or its designee must be confirmed and approved by [K&K] or its designee. Notwithstanding this paragraph, any transaction over $15,000.00 must be approved by [K&K] or its designee.

2.22 [LMLC-M] shall take all necessary steps in order to open the School in a timely manner, which shall be no longer than twelve (12) months from the effective date of this Agreement. The opening shall be defined as the time when the doors have opened for children to begin attending the School. If the opening of the School is delayed for more than twelve (12) months, for each month of delay, [LMLC-M] shall credit [K&K] an amount equal to one month's management fee and shall continue to not charge [K&K] any management fee, until such time that the School has been opened.

\*\*\*

5.1. Initial Management Fee- This fee is due and payable at the execution of this Management Agreement, [K&K] shall pay [LMLC-M] a management fee of $20,000 . . . ("Initial Management

9

Fee"). This is a onetime fee which pays for school set up and launch as well as management of the first year of operation of School and which shall be non-refundable. This shall be paid according to a Capital Injection Schedule ("CIS") in the form attached hereto. The CIS shall be completed prior to, or at the time, this Agreement is executed.

\*\*\*

5.6. **OPERATING CAPITAL ACCOUNT**. [LMLC-M] shall maintain an account against which [LMLC-M] can issue checks (the 'Operating Capital Account'). Upon the execution of this Agreement, [K&K] will be required to place a sum of money into the Operating Capital Account. The total sum, to be made in installments according to the CIS which is to be completed prior to, or at the time, this Agreement is executed, in the amount of $230,000 . . . and shall be paid into the Operating Capital Account. These funds are to be used solely for franchise fee and business expenses according [to] the business plan accompanying this Agreement, subject to any future amendments to the business plan. Notwithstanding the forgoing, in any event, [K&K] agrees to maintain a balance in the Operating Capital Account sufficient to cover all the expenses related to the operation of the Business. If [K&K] is a foreign person applying for issuance of a visa through the Secretary of State or for an immigration benefit through USCIS, upon rejection, denial, or revocation of said application, [K&K] may withdraw all of funds from the Operating Capital Account upon Transfer of its interest in Franchise Agreement to an approved third party relationship entity.

\*\*\*

9.1. **RELATIONSHIP OF FRANCHISEE AND MANAGER**. Everything done by [LMLC-M] shall be done as the agent and representative of [K&K], provided it is within the scope of authority granted herein. Neither party shall have the power to bind or obligate the other except as set forth in this Agreement, but [LMLC-M] shall have such additional authority and power as may be reasonably necessary to carry out the spirit and intent of this Agreement."

(PX 4, PX 5).

31.     In addition, the Management Agreements provided that a total of $250,000 was to be paid for each location by May 1, 2018, and required K&K to "maintain a balance in the Operating Capital Account sufficient to cover all expenses related to the operation of the Business." (PX 4, PX 5).

32.     Consistent with the Franchise and Management Agreements, Mr. K, on behalf of K&K, executed the POA, which granted LMLC-M, LMLC-F, Barnhardt and any other designee authority to establish a bank account for K&K and manage all funds consistent with their agreements. (PX 7).

33.     Specifically, the POA provided that "[Mr. K.], on behalf of [K&K] ("Company") appoints [LMLC-F], [LMLC-M], Todd A Barnhart, and his delegates ("Agent"), . . . , as agent for Company to act in any lawful way pursuant to the Management Agreement[s] between Company, and [LMLC-M] with respect to performing the powers listed below." (PX 7).

34.     In late April 2017, lease agreements were executed for K&K's two LMLC locations in Crystal Lake and Montgomery, Illinois. The leases were executed by K&K as tenant and LMLC-F and Mr. K. as guarantors. (PX 16 (Crystal Lake Lease); PX 20 (Montgomery Lease)).

**B.      Contract Performance**

35.     After the contract documents were executed in April 2017, Plaintiffs deposited $100,000 in the Operating Capital Account for the projects. Of that initial deposit, a total of $80,000 was committed to up front franchise and management fees under the terms of the agreements. (*See* Crystal Lake Franchise Agmt. § 4.A.1. ($20,000 franchise fee); Montgomery Franchise Agmt. § 4.A.1. ($20,000 franchise fee); Crystal Lake Mgmt. Agmt. § 5.1 ($20,000 management fee); Montgomery Mgmt. Agmt. § 5.1 ($20,000 management fee)).

36.     Beginning in April 2017, Defendants started work to open the LMLC franchises at the Crystal Lake and Montgomery locations.

37.     Barnhardt, on behalf of LMLC-M, had opened a primary checking account for K&K at US Bank with an account number ending in 5008 (the "Operating Capital Account").[4]

38.     Plaintiffs contributed a total of $469,950 in capital prior to January 1, 2018. (PX 9).

39.     On May 1, 2017, Defendants transferred twenty thousand dollars ($20,000) from K&K's bank account to an account owned by LMLC-M.

40.     On May 3, 2017, Defendants transferred twenty thousand dollars ($20,000) from K&K's bank account to an account owned by LMLC-M.

41.     On June 2, 2017, Defendants transferred ten thousand dollars ($10,000) from K&K's bank account to an account owned by LMLC-M.

42.     On August 31, 2017, Defendants transferred five thousand dollars ($5,000) from K&K's bank account to an account owned by LMLC-M.

43.     On February 9, 2018, Defendants transferred eighteen thousand dollars ($18,000) from K&K's bank account to an account owned by LMLC-M.

44.     On February 12, 2018, Defendants made three transfers, for five thousand dollars ($5,000), thirteen thousand dollars ($13,000), and fifteen thousand dollars ($15,000) from K&K's bank account to an account owned by LMLC-M.

45.     On March 1, 2018, Defendants transferred five hundred dollars ($500) from K&K's bank account to an account owned by LMLC-M.

---

[4] The record contains bank statements for that account from April 2017 to October 2018. (PX 9 at 0001-0116). But there are also bank statements for another checking account opened for K&K at US Bank ending in account number 2353 spanning from November 2018 to September 2019. (PX 9 at 0117-0178). The Court did not hear an explanation at trial for the two accounts but each is referenced in the general ledger. (PX 38 at 0001). For avoidance of doubt, the Court presumes that relevant bank transactions involved funds added to or withdrawn/transferred from either account, and thus both accounts are treated as the K&K operating capital account.

46. On June 15, 2018, Defendants transferred one thousand eighty seven dollars and 29/100 dollars ($1,087.29) from K&K's bank account to an account owned by LMLC-M.

47. On July 12, 2018, Defendants transferred fifteen thousand dollars ($15,000) from K&K's bank account to an account owned by LMLC-M.

48. On July 16, 2018, Defendants made two transfers, for thirteen thousand dollars ($13,000) and nine hundred dollars ($900), from K&K's bank account to an account owned by LMLC-M.

49. On November 6, 2018, Defendants transferred one thousand five hundred dollars ($1,500) from K&K's bank account to an account owned by LMLC-F.

50. On February 1, 2019, Defendants made two transfers, for one thousand dollars ($1,000) and two hundred twenty dollars ($220), from K&K's bank account to an account owned by LMLC-H.

51. On February 14, 2019, Defendants transferred eighty dollars ($80) from K&K's bank account to an account owned by LMLC-F.

52. On February 19, 2019, Defendants transferred six hundred dollars ($600) from K&K's bank account to an account owned by LMLC-F.

53. On February 20, 2019, Defendants transferred six hundred dollars ($600) from K&K's bank account to an account owned by LMLC-F.

54. On March 1, 2019, Defendants made two transfers, for four hundred dollars ($400) and five hundred dollars ($500), from K&K's bank account to an account owned by LMLC-F.

55. In sum, the parties stipulate that Defendants transferred a total of $141,387.29 from K&K's bank account to accounts owned by Defendants from May 2017 through March 2019.

56.     Five thousand four hundred eighty-six dollars ($5,486) of overdraft fees were incurred during the period of time that Defendants had exclusive control over and responsibility for managing K&K's bank account. (PX 9; PX 38).

57.     LMLC-M withheld notification of those withdrawals from any report provided to Plaintiffs.

58.     Barnhardt testified that although Plaintiffs initially paid the $40,000 franchise fee, LMLC-F refunded $34,991 to K&K due to capital shortages, including negative balances in the operating account between 2017 and 2019, which Plaintiffs did not repay.

59.     Barnhardt testified that although Plaintiffs paid the $40,000 management fee in portion, Defendants refunded the entire $40,000 due and owing to K&K, which Plaintiffs did not repay. LMLC-M also deposited an additional $34,667.56 in K&K's operating account to cover deficits and help the businesses continue to run, which Plaintiffs did not repay.

60.     Barnhardt testified that the Montgomery facility had a unique structure that necessitated a buildout for it to function as a childcare center. The landlord required Plaintiffs to put 12 months of rent, approximately $138,000, into a trust account that the landlord would match and put towards the cost of the facility buildout. Construction did not start on time, however, because K&K did not deposit sufficient funds in a timely manner. Although construction eventually began after Barnhardt convinced the landlord that the rest of the funds were coming based on statements by Kameli to Defendants and to the landlord, because of the funding delays, the buildout was never completed, operating equipment was never purchased, and no childcare center license was obtained.

61.     Plaintiffs were subsequently evicted and the landlord took possession of the Montgomery property.

62.     Barnhardt testified that the Crystal Lake facility was a former childcare center that opened as an LMLC center in summer 2017 and was run by LMLC-M until mid-2019 when Sharegh took over operations at Plaintiffs' request.

63.     The landlord eventually took possession of the Crystal Lake property.

64.     LMLC-M failed to timely file K&K's 2019 annual report with the Illinois Secretary of State.

65.     LMLC-M failed to timely pay the water bill for K&K's Crystal Lake location.

66.     LMLC-M failed to timely pay the Fire Protection invoice from May 21, 2019 on behalf of K&K.

67.      LMLC-M failed to timely pay income taxes to the State of Illinois on behalf of K&K.

68.     LMLC-M failed to timely pay federal income taxes on behalf of K&K.

69.     LMLC-M failed to timely pay amounts K&K was required to submit to the Illinois Department of Employment Security (IDES).

70.     LMLC-M failed to timely pay rent K&K owed to landlords of the Montgomery and Crystal Lake locations.

71.     LMLC-M failed to timely pay employees of K&K.

72.     LMLC-M failed to timely pay invoices including amounts due to Cintas, Comcast, ComEd, and SJ Carlson Fire Protection on behalf of K&K.

73.     LMLC-M never communicated a single nonpayment to Plaintiffs.

74.     Barnhardt testified that he had regular daily and weekly conversations with Kameli, who was his main point of contact for Plaintiffs, about the status of the project at both facilities.

75.     On November 20, 2019, all Defendants filed chapter 7 bankruptcy petitions.

76. The bankruptcy cases of LMLC-F and LMLC-M were closed in July 2020.

77. Barnhardt agreed to a voluntary waiver of discharge, which was approved by the bankruptcy court in November 2020.

## CONCLUSIONS OF LAW

### I. Plaintiffs' Claims

#### A. Count I – Breach of Contract (K&K v. LMLC-M)

78. Under Illinois law,[5] "[t]he essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) [a] resultant injury to the plaintiff." *Babbitt Mun., Inc. v. Health Care Serv. Corp.*, 2016 IL App (1st) 152662, ¶ 27 (quoting *Batson v. Oak Tree, Ltd.,* 2013 IL App (1st) 123071, ¶ 35)).

79. A plaintiff cannot prevail on a breach of contract claim, however, if the defendant shows that the plaintiff committed the first material breach. *Fermaint v. Planet Home Lending, LLC*, No. 18 C 7325, 2023 WL 5227381, at *23 (N.D. Ill. Aug. 15, 2023). "A breach is material where the covenant breached is one of such importance that the contract would not have been entered into without it." *Wolfram P'ship, Ltd. v. LaSalle Nat. Bank*, 328 Ill. App. 3d 207, 223, 765 N.E.2d 1012, 1025 (2001), *as modified on denial of reh'g* (Mar. 20, 2002); *see also Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (discussing issues that are focus of materiality inquiry).

80. K&K claims that LMLC-M breached at least Sections 2.13, 2.21, and 5.6 of the Management Agreements by making unauthorized transfers in excess of $140,000 from the K&K

---

[5] The parties have not asked the Court to revisit its decision to apply the substantive law of Illinois. (*See* 2/21/24 Oral Ruling, Dkt. 176).

Operating Capital Account to Defendants' accounts. Section 2.13 of the Management Agreement required LMLC-M to manage the Operating Capital Account such that it was not depleted and communicate with K&K regarding the balance of the account. Section 2.21 required LMLC-M to obtain confirmation and approval from K&K or its designee for any transaction over $5,000, excluding payroll, lease, or amounts due under the Agreements, and approval for any transaction over $15,000, regardless of the type of transaction. Section 5.6 provided that funds deposited in the Operating Capital Account were to be used solely for franchise fee and business expenses.

81.    Barnhardt, as LMLC-M manager, counters that the transferred funds were owed to Defendants for the franchise and management fees and payments made on behalf of K&K in accordance with Sections 1.1 (i) and (k) that authorized LMLC-M to grant and establish credit in connection with operation of the business and enter into appropriate contracts, agreements, and undertakings.

82.    Plaintiffs offered no rebuttal to Barnhardt's testimony that K&K still owed nearly $80,000 for franchise and management fees, in addition to about $30,000 which Defendants had provided to keep the business afloat, for a total due back to LMLC-F and LMLC-M of nearly $110,000.

83.    The Court acknowledges the parties' stipulation that Defendants transferred $141,387.20 to themselves, which arguably suggests that over $30,000 in funds are not accounted for here. However, Barnhardt attested only to the amount due and owing on Counter-Plaintiffs' counterclaim—$34,667.56 in unreimbursed business expenses—not the total amount given.

84.    Indeed, it is Plaintiffs who bear the burden of proving that Defendants' actions were unauthorized under the contract. Merely pointing out that funds were transferred and overdraft fees were incurred is insufficient to establish that a breach occurred.

17

85.     Barnhardt contends that K&K failed to comply with section 5.6 of the Management Agreement, by not sufficiently funding the project to avoid deficits, which is what necessitated the "loans" from Defendants to ensure that legitimate business expenses could be covered. The K&K Operating Account bank statements reflect payments for payroll, equipment, supplies, and leases, along with deposits of tuition payments. K&K offered no evidence to refute LMLC-M's defense that the transferred funds were appropriately used for center operations, consistent with the terms of the Management Agreements.

86.     For these reasons, the Court enters judgment in favor of LMLC-M and against K&K on Count I for breach of contract.

**B.      Count II – Breach of Fiduciary Duty (K&K v. LMLC-M & Barnhardt)**

87.     In order to prevail on a breach of fiduciary duty claim under Illinois law, a plaintiff must prove that: (i) a fiduciary duty exists; (ii) the duty was breached; and (iii) such breach proximately caused the plaintiff's injury. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000).

88.     K&K claims that LMLC-M and Barnhardt owed fiduciary duties to K&K in connection with the funds in the K&K capital account by virtue of the Management Agreements, POA, and having been entrusted with handling those funds. According to K&K, LMLC-M and Barnhardt breached those duties by making the unauthorized transfers and such breaches proximately caused injuries by diverting K&K's investment for the benefit of others and ultimately resulting in the failure of the Crystal Lake and Montgomery locations.

89.     Even assuming that both LMLC-M and Barnhardt owed such a fiduciary duty to K&K, as with the contract claim, K&K has not shown that Defendants breached that obligation.

90.     Certainly, from early 2017 through mid-2019, Barnhardt had access to the entire $469,950 that K&K contributed to its Operating Capital Account before January 2018. Thereafter,

Barnhardt, as LMLC-M manager, was tasked with using those funds to establish and maintain center operations in accordance with the governing documents.

91.     Plaintiffs do not offer testimony or evidence suggesting the Montgomery location failed to succeed because Defendants mismanaged these funds. Nor do Plaintiffs identify any wrongdoing by Defendants in connection with the Crystal Lake location that operated with staff and students for nearly two years.

92.     At most, Plaintiffs complain that their investment did not pan out and they lost significant sums of money as well as the opportunity to obtain U.S. citizenship through the EB-5 Program. But that is the nature of risky investment deals.

93.     Defendants had been granted a broad power of attorney affording them unfettered control over the bank accounts and these businesses, subject to the franchise and management agreements. While Plaintiffs ostensibly contend that Defendants acted contrary to those terms, they have not come forward with anything more than their speculation to support that argument.

94.     Barnhardt, on the other hand, testified that he had daily and weekly conversations with Kameli about the projects. And Plaintiffs' own documents include emails about financial and operational reports that had been provided to them from Defendants during the relevant timeframe. (*See* PX 1; PX 60-62; PX 64; PX 66).

95.     In short, the evidence does not show that Barnhardt, individually or on behalf of LMLC-M, acted in his own self-interest by effectuating transfers, let alone that his actions fell short of the "duty . . . to exercise utmost care, candor, loyalty and good faith in [his] dealings" that arises from a  fiduciary relationship. *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 673 (1st Dist. 1997). Thus, Plaintiffs have not met their burden of proof.

96.     For these reasons, the Court enters judgment in favor of Defendants and against Plaintiffs on Count II for breach of fiduciary duty.

### C.     Counts IV & VI – Fraudulent Misrepresentation (Plaintiffs v. Defendants)

97.     To prove a claim for fraudulent misrepresentation, a plaintiff must show: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's [justifiable] reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996)); *see also Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 193 (1989); *Soules v. Gen. Motors Corp.*, 79 Ill. 2d 282, 286 (1980).

98.     A plaintiff must prove each element of fraud by clear and convincing evidence. *See Metro. Cap. Bank & Tr. v. Feiner*, 2020 IL App (1st) 190895, ¶ 44 (holding that trial court did not err by applying the clear and convincing standard to each element of fraud claim). "Clear and convincing evidence is considered 'to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense.'" *Metro. Cap.*, 2020 IL App (1st) 190895, ¶ 39 (quoting *Parsons v. Winter*, 142 Ill. App. 3d 354, 359 (1st Dist. 1986)).

99.     According to Plaintiffs, Defendants fraudulently misrepresented the need for and use of funds from the Operating Capital Account during performance of the contract. In addition, Plaintiffs claim that the financial ledgers provided by Defendants misrepresented the transactions and balances of the Capital Operating Account.

100.    Having carefully considered the evidence and testimony, the Court concludes that Plaintiffs have not carried their burden of proving by clear and convincing evidence that any

statements requesting funding for use on legitimate business expenses were false at the time they were made or that Defendants knew the statements were false.

101.    Furthermore, Plaintiffs have not sufficiently established that their reliance on Defendants' statements were justified. Parties to a business transaction ordinarily guard their own interests by trusting but verifying that the counterparty is performing as promised under their agreement. While parties are free to conduct themselves as they wish and such precautions are not generally required, Illinois law does require that reliance on a representation of another be *justifiable* to prove a claim for fraud.

102.    Here, Plaintiffs entrusted parties they had never met in-person who lived on the opposite side of the world and did not speak their native language with significant sums of their money. Although Plaintiffs, their counsel, and even their representative seem to have generally monitored communications from Defendants regarding the progress of the projects and spending of Plaintiffs' funds, there is not sufficient evidence of Plaintiffs' diligence in verifying Defendants' statements along the way. Had Plaintiffs obtained a bank statement for their very own account (*i.e.*, the K&K Operating Capital Account) or demanded proof of business expenses being paid as reported, they would have seen some discrepancies.

103.    In addition, with respect to any financial ledgers that omitted the allegedly unauthorized transfers, the evidence showed that those ledgers were provided after Plaintiffs had deposited their funds, so it is impossible for Plaintiffs to have relied on that information to their detriment.

104.    For these reasons, the Court enters judgment in favor of Defendants and against Plaintiffs on Counts IV and VI for fraudulent misrepresentation.

### D. Defendants/Counter-Plaintiffs' Affirmative Defenses and Amended Counterclaims

105.    Defendants/Counter-Plaintiffs LMLC-M and LMLC-F presented evidence at trial in support of breach of contract claims for the unpaid capital contributions and additional amounts contributed to K&K's Operating Account to cover expenses (Counts I and III).

106.    Barnhardt testified that, as manager of LMLC-M and LMLC-F with oversight for K&K's bank accounts and operations, he used Counter-Defendants' funds to cover K&K business expenses. Specifically, Barnhardt, on behalf of LMLC-F, refunded $34,991 to K&K for the franchise fee, and on behalf of LMLC-M, refunded $40,000 to K&K for the management fee, and contributed $34,667.56 to the K&K Operating Account which remains unpaid.

107.    As already discussed, Plaintiffs/Counter-Defendants did not rebut his testimony at trial. The Court having had the opportunity to observe Barnhardt at trial finds his testimony to be credible and uncontroverted. Thus, those amounts are owed from K&K to LMLC-M and LMLC-F.

108.    Accordingly, judgment is entered for Counter-Plaintiffs and against Counter-Defendants on Counts I and III of the Amended Counterclaims. Because Counter-Plaintiffs did not present any evidence in support of its other counterclaims, judgment is entered in favor of Counter-Defendants and against Counter-Plaintiffs on Counts II, IV, V, and VI of the Amended Counterclaims.

## II. Damages

109.    Having entered judgments in favor of LMLC-M and against K&K on Count I for breach of capital contributions and in favor of LMLC-F and against K&K on Count III for breach of franchising agreement, the Court must consider the appropriate remedy.

110.    Counter-Plaintiffs seek the following relief, as reflected in the Damages Itemization, (Dkt. 213): (1) LMLC-F: contract damages—amount due totaled $40,000 but only

$5,009 was paid leaving a balance due of $34,991; and (2) LMLC-M: contract damages—amount due of $74,667.56 based on a management fee due of $40,000 and additional unpaid funds of $34,667.56 deposited into Plaintiffs' accounts to cover expenses.

111. At trial, K&K reserved the right to request attorney fees under the contracts in the event damages were awarded to K&K.

112. "The normal remedy for breach of contract is an award of damages." *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). Generally, Illinois law permits: direct damages, which consist of the value of benefits that should have been received under the contract, less any amount received; special damages, which consist of amounts reasonably foreseeable when the contract was made; and incidental damages, which consist of the amount spent responding to breach. *See* IPI, Contracts, 700.13 (Damages).

113. In calculating damages, a court must determine the amount that will put the plaintiff in as good of a position as it would have been if all of the promises under the contract had been performed. *Ollivier v. Alden*, 262 Ill. App. 3d 190, 196 (2d Dist. 1994). The party seeking to recover damages has the burden to establish both the correct measurement of damages and the final computation of damages based on that measurement. *Id.* "While damages do not need to be calculated with mathematical precision, basic contract theory requires reasonable certainty and precludes damages based on conjecture or speculation." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 62.

114. Based on these principles, the Court concludes that a total damages award of $109,658.56, which is the unpaid amount Defendants requested, is appropriate.

## CONCLUSION

For all the above reasons, judgment is entered in favor of Defendants and against Plaintiffs on Plaintiffs' complaint; in favor of Counter-Plaintiff LMLC-M and against Counter-Defendant K&K on Count I of the Amended Counterclaim, awarding damages in the amount of $74,667.56; in favor of Counter-Plaintiff LMLC-F and against Counter-Defendant K&K on Count III of the Amended Counterclaim, awarding damages in the amount of $34,991; and in favor of Counter-Defendants and against Counter-Plaintiffs on Counts II, IV, V, and VI of the Amended Counterclaim.

**DATED**: July 18, 2025                    **ENTERED**:

_LaShonda A. Hunt_
_____
LaShonda A. Hunt
United States District Judge